## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **CHARLES H. PIERSALL III,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 03-1770 (RCL)** |
| | ) | |
| **DONALD C. WINTER,** | ) | |
| **Secretary of the Navy,** | ) | |
| | ) | |
| **Defendant**. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION</u>

This matter comes before the Court on cross-motions for summary judgment.  Plaintiff,

Charles H. Piersall, III, brings this action under the Administrative Procedure Act for review of

the Secretary of the Navy's decision not to remove from his military records a 1998 letter of

reprimand, as well as any mention of the nonjudicial punishment proceeding that prompted the

letter.  Upon consideration of the entire administrative record, the briefs submitted by the parties,

and the applicable law, the Court determines that plaintiff's motion for summary judgment must

be denied, while defendant's must be granted, because the Secretary's decision, as embodied in

the report and recommendations of the Board for Correction of Naval Records which he

approved, is not arbitrary or capricious, unsupported by substantial evidence, or contrary to law.

The Court's reasons are set forth more fully below.

## I.      BACKGROUND

### A.      Factual & Procedural History[1]

_____

[1]This history is drawn primarily from the Administrative Record ("AR") and Amended
Complaint, where the latter is supported by the former.  A comparison of the plaintiff's

Plaintiff, Charles Piersall III, was a Commander in the Navy at the time he filed this lawsuit in 2003.[2]  On February 11, 1998, Piersall was the Executive Officer of the nuclear submarine *USS La Jolla,* when *La Jolla* collided with *Young Chang Ho*, a Korean fishing trawler, in the waters outside the Chinhae naval base in the Republic of Korea.  Amended Complaint ("1AC") ¶ 10.  While the fishing boat sank, the *La Jolla* suffered only minor damage and was able to rescue the *Young Chang Ho*'s crew.  *Id*.  There were no serious injuries to either of the two crews.  *Id*.  *La Jolla* proceeded to Chinhae and docked there.

On February 19, 1998, Rear Admiral A.H. Konetzni, Jr., the Commander of Submarine Group 7, held "mast" proceedings for Piersall and other crew members in connection with the *Young Chang Ho* collision.[3]  1AC ¶12.  As described at greater length below, "mast" or "captain's mast" refers to a type of nonjudicial punishment carried out in the Navy in response to minor offenses.  These summary proceedings do not come with the full panoply of procedural rights afforded at courts martial, nor do they carry the same potentially severe punishments associated with the latter.

In this case, Piersall's mast was held at the Robinson Center, a building at the Chinhae

_____

Statement of Material Facts [11] and Supplemental Statement of Material Facts [48-3], with the defendant's Statement of Material Facts [45], demonstrates that there is no genuine dispute over a factual issue that the Court deems material.

[2]The named defendant in Piersall's suit is the Secretary of the Navy: Hansford "H.T." Johnson when the suit was filed, later Gordon R. England, and now Donald C. Winter.

[3]As a result of the Navy's penchant for lengthy acronyms, the record often refers to Submarine Group Seven as "SUBGRU SEVEN" and to its commanding officer as "COMSUBGRU SEVEN."

facility located roughly two miles from where *La Jolla* was moored.[4]  *Id*. ¶ 13.  After a hearing,

Admiral Konetzni found that Piersall had been derelict in failing to prevent the collision, and he

declared that a letter of reprimand would be issued as punishment.  *Id*. ¶¶ 12, 14.  He also

ordered the initiation of the process to detach from *La Jolla* for cause, though Piersall remained

assigned to the ship.  Piersall briefly returned to *La Jolla* after the mast to retrieve personal

possessions, spent the night on shore at Chinhae, and flew to the United States the next day.  *Id*. ¶

17.

On March 1, 1998, Piersall reported to the Commander, Third Fleet in San Diego,

California, for temporary additional duty, to be served aboard *USS Coronado*.  AR at 215.  The

letter of reprimand that resulted from the mast proceeding was prepared and dated March 2,

1998.  1AC ¶ 14.  It was physically delivered to Piersall on March 6, 1998, on dry land.  *Id*. at ¶

14.  The letter from Admiral Konetzni stated that "you received nonjudicial (NJP) on 19 Feb 98,"

and explains that "I imposed NJP" because Piersall "was derelict in the performance of [his]

duties in that he negligently failed as the ship's Executive Officer and Command Duty Officer to

prevent the USS LA JOLLA . . . from colliding with a [Korean] fishing vessel, as it was his duty

to do so."  AR at 158.  Konetzni explained that "I made my decision to impose NJP" after

considering items of evidence which "clearly show that [Piersall was] derelict in the performance

of [his] duties," and that his "conduct demonstrates poor judgment and a lack of leadership."  *Id*.

_____

[4]The Court acknowledges plaintiff's contention that the distance between the Robinson Center and *La Jolla* may have been more in the range of three miles.  This factual dispute is not material here and plaintiff does not seem to contend that it is.  As the Court's analysis demonstrates, the vessel exception calls for a fact-bound inquiry in which, depending on the circumstances, differences in degree of proximity to a ship could be important.  Based on the circumstances of this case, the outcome is the same whether the distance is two or three miles.

On February 26, 1999, Piersall was ordered detached from *La Jolla* and from Commander, Third Fleet, and directed to other duties.  AR at 215.  In early 2000, he petitioned the Board for Correction of Naval Records ("BCNR"), to remove the consequences of his 1998 mast proceeding from his naval record.  1AC ¶ 18; AR at 2-4.  The BCNR is a civilian board that reviews applications to change naval records, and then issues reports and recommendations on those applications to the Secretary of the Navy, who makes the final determination on the application, or does so through a delegate.  In an April 30, 2003 report, the BCNR granted some of Piersall's requested relief, but declined to expunge the letter of reprimand from his record.[5] AR at 102-03.

Piersall's basis for seeking expungement of the letter of reprimand was that he was not afforded the opportunity to decline to proceed with the mast and to opt instead for court martial. Service personnel have a right to refuse nonjudicial punishment and demand a court martial, so long as they are not "attached to or embarked in a vessel."[6]  10 U.S.C. § 815(a).  The BCNR held that Piersall did not have a right to refuse mast because he was attached to or embarked in a vessel, namely *La Jolla*, and thus there was no error or injustice in his record to be corrected. The Secretary of the Navy adopted this recommendation and denied Piersall relief.

In August of 2003, Piersall filed suit in this Court under the Administrative Procedure Act, alleging that the BCNR's determination, as endorsed by the Secretary of the Navy's delegate, was arbitrary and capricious and contrary to law, and therefore requesting that the Court

---

[5]Piersall requested that his detachment for cause from *La Jolla* be set aside and that a particular fitness report be removed from his record, which they were.

[6]The BCNR rejected other arguments advanced by Piersall, as discussed more fully *infra*.

4

set aside the BCNR's decision, order that the mast and letter of reprimand be expunged from Piersall's Navy record, and remand the matter to the BCNR for further appropriate relief.  In a September 21, 2004 Order [18], this Court granted the Secretary's motion to dismiss for lack of subject matter jurisdiction.  The Court of Appeals reversed, finding that subject matter jurisdiction was appropriate, and remanded with instructions to assess the merits under the "particularly deferential standard of review" appropriate when reviewing agency action of this nature.  *Piersall v. Winter*, 435 F.3d 319, 325 (D.C. Cir. 2006).

On June 26, 2006, the Navy's Assistant General Counsel for Manpower and Reserve Affairs issued a memo withdrawing his endorsement of the BCNR panel's findings related to Piersall's NJP, insofar as the applicability of the vessel exception was concerned.  AR at 110. The Assistant General Counsel stated that his approval of the BCNR's April 2003 recommendations was based on incomplete information about Piersall's stint with Third Fleet, and he ordered a new BCNR panel to perform a *de novo* review of Piersall's NJP, limited to the question of whether the vessel exception applied.  *Id.*  Upon the Secretary's motion, the Court issued a July 21, 2006 Order [35] remanding the matter to the Navy for review by the BCNR.

In subsequent correspondence, the Assistant General Counsel instructed the new BCNR panel to focus its review on the vessel exception as applied in Piersall's case.  AR at 213-14. The second panel convened on November 28, 2006 and issued an opinion on December 11, 2006.  AR at 213-238.  The BCNR found that Piersall was attached to *La Jolla* at the time NJP was imposed and thus was subject to the vessel exception, and had no right to refuse NJP.  The BCNR panel recommended no further relief for Piersall, having found no error or injustice to correct.

5

The Assistant General Counsel endorsed the BCNR's recommendation on behalf of the

Secretary of the Navy on December 26, 2006.  AR at 238.  It is this decision of the Secretary,

acting through the Assistant General Counsel, to adopt the BCNR's recommendation not to

provide further relief to Piersall, which is the final agency action forming the subject of this

Court's review.[7]

**B.     Legal Framework**

**1.     Applicable Statutes and Regulations**

Under the Uniform Code of Military Justice, military commanders can punish service

personnel through judicial proceedings – taking the form of general, special, or summary courts

martial – or by imposing non-judicial punishment ("NJP").  *See generally Chappell v. Wallace*,

462 U.S. 296 (1983); *Middendorf v. Henry*, 425 U.S. 25 (1976).  NJP is referred to as "captain's

mast" or "mast" in the sea services, as "office hours" in the Marine Corps, and as "Article 15" in

the Army and Air Force, after the article of the UCMJ that governs NJP.  10 U.S.C. § 815.  For

most purposes, NJP is deemed an administrative rather than criminal proceeding.  *See, e.g.,*

*Cappella v. United States*, 624 F.2d 976 (Ct. Cl. 1980).

At issue in this case is the "vessel exception."  Article 15 states that "except in the case of

a member attached to or embarked in a vessel, [nonjudicial] punishment may not be imposed

upon any member of the armed forces under this article if the member has, before the imposition

of such punishment, demanded trial by court-martial in lieu of such punishment."  10 U.S.C. §

815(a).  The vessel exception first arose when the Uniform Code of Military Justice was adopted

---

[7]While the Court may at times refer directly to the BCNR's report and recommendations, it is the Secretary's decision to adopt the report and recommendations that is the agency action under review.

in 1949, which established Article 15 proceedings for nonjudicial punishment, but stated that the

traditional naval punishment of confinement on bread and water could only be imposed on those

attached to or embarked in a vessel.  The service branches devised their own implementing

regulations for Article 15, and while the Army and Air Force issued regulations permitting their

members to refuse Article 15 proceedings and demand court martial, the Navy and Marines did

not.  In 1962, Congress amended Article 15 of the UCMJ, increasing the range and severity of

punishments that could be imposed thereunder, but adding the right to refuse nonjudicial

punishment, and to demand a court martial instead, to all service members.  The only exception

was that this right of refusal would not apply to service members who are "attached to or

embarked in a vessel."  This was the vessel exception, "which presumably Congress created

because the special conditions prevailing aboard a ship require quick, decisive enforcement of

justice by its captain."  *Dobzynski v. Green*, 16 M.J. 84, 86 (C.M.A. 1983) (Everett, C.J.,

dissenting).

      In brief, the rationale for the vessel exception is based on the traditionally recognized

exigent circumstances that are unique to the command of seagoing vessels.  Historically, the

commanders of ships at sea could exercise disciplinary authority over their crewmen with almost

no restriction.  *See United States v. Penn*, 4 M.J. 879 (C.M.R. 1978).  This power was restricted

over time, as embodied in the UCMJ, but "[a]ll such statutes and regulations, however, have

implicitly recognized that unique responsibility of a ship's captain as the master of a frequently

isolated community of sailors; the peculiar vulnerability of this independent society to disorderly

practices; and hence the essentiality of affording the captain the authority to swiftly and surely

'discountenance and suppress all dissolute, immoral, and disorderly practices,' and to

expeditiously 'correct those who are guilty of the same.'" *Penn*, 4 M.J. at 882 (quoting Rules for

the Regulation of the Navy of the United States (1775)).  This traditional balancing finds one

expression in Article 15, which grants commanders discretion to impose swift, informal

discipline, with certain restrictions.[8]  It also has been recognized that the same exigencies

sometimes apply to ships that are not out to sea, but still have the same need for swift, efficient

discipline because of their unique circumstances.[9]

### 2.       Interpretations of the Vessel Exception

After Congress passed the 1962 UCMJ amendments, the executive branch had a limited

time frame within which to enact implementing regulations.  The regulations were embodied in

the Manual for Courts Martial ("MCM"), an Executive Order with the force of law.  The MCM

described the vessel exception in Paragraph 132:[10]

> A person is 'attached to' or 'embarked in' a vessel if, at the time the non-judicial
> punishment is imposed, that person is assigned or attached to the vessel, is on board for
> passage, or is assigned or attached to an embarked staff, unit, detachment, squadron,
> team, air group, or other regularly organized body.

> (reprinted in AR at 122).

---

[8]In discussing Article 15 punishments, the Supreme Court has observed that "[t]he inescapable demands of military discipline and obedience to orders cannot be taught on battlefields; the habit of immediate compliance with military procedures and orders must be virtually reflex with no time for debate or reflection."  *Chappell v. Wallace*, 462 U.S. 296, 300 (1983).

[9]For instance, "[i]f those attached to a ship were permitted to demand special or general court-martial for any minor offense whenever their ship was in port, commanders frequently would be confronted with totally unacceptable alternatives: (1) Leaving accused persons and all witnesses ashore when ships put out to sea; (2) regulating ships' itineraries around courts-martial; or (3) permitting minor infractions to go unpunished."  *Penn*, 4 M.J. at 883.

[10]The numbering of the MCM has changed over time, such that what was Paragraph 132 is now Paragraph 3 of Part V of the MCM, though the wording remains essentially the same.

In January of 1963 Assistant Attorney General Norbert Schlei submitted a memorandum to President Kennedy that summarized the changes to the MCM.  This "Schlei memorandum" acknowledged that the vessel exception as stated in Paragraph 132 of the MCM  "could be construed to deny the right of election to members who are assigned to organizations which have received overseas travel orders even though those organizations are still at duty stations that are considerably removed from the vessel involved, and without regard to whether actual boarding of the vessel is planned for the immediate future (for example, an organization at a base 100 miles from the port involved, and scheduled for overseas shipment 30 days in the future).  This would appear to be inconsistent with the congressional intent."  AR at 220.

In response to this hypothetical, Schlei wrote that military representatives had said they had "no intention of denying an election to any member pursuant to paragraph 132 unless he is either aboard vessel or unless he is in the immediate vicinity of a vessel and is in the process of boarding.  The only exception to this rule would involve the possible denial of election to members attached to vessels who are absent without authority in foreign ports."  *Id*.  Schlei then stated that because there did not appear to be time to further revise the MCM, and because his memo would be circulated to the service Secretaries with the understanding that they agreed with and would apply his interpretation of the vessel exception, the President should sign the Executive Order and adopt the MCM, which he indeed did.  Exec. Order No. 11,084, 28 Fed. Reg. 945 (1963).  In the case *sub judice*, plaintiff argues that the vessel exception can only apply where one of the three situations described by Schlei pertains by its literal terms: the service member is (1) aboard a vessel; or (2) "in the immediate vicinity of a vessel and . . . in the process of boarding;" or (3) is absent without authority in a foreign port.

The most significant case addressing the Schlei memorandum is *United States v. Edwards*, 46 M.J. 41 (C.A.A.F. 1997).  In that case, the Court of Appeals for the Armed Forces ruled that the operational status of a naval vessel is relevant to whether the vessel exception should apply.  In so doing, it held that the phrase "attached to or embarked in a vessel" has the same meaning in Article 15(a) as in Article 15(b)(2)(A), where it is used to specify the circumstances in which confinement on bread and water can be imposed.  *Id.* at 43.  This meant that the same factors considered in Article 15(b)(2) cases, such as *United States v. Yatchak*, 35 M.J. 379 (C.M.A. 1992), and *United States v. Lorance*, 35 M.J. 382 (C.M.A. 1992), could and should be considered in Article 15(a) cases dealing with the right to refuse nonjudicial punishment.

The court stated that an analysis of the applicability of the vessel exception proceeds in two parts: "(1) Was appellant's relationship to the ship sufficient to satisfy what Congress intended by the words 'attached to or embarked in,' and thus sufficient to trigger the exception to the statutory right to demand trial and the ancillary right to consult with counsel before deciding whether to demand trial? and (2) Was the ship a 'vessel' within the meaning of Article 15?"  *Edwards*, 46 M.J. at 43-44.  In framing the "relationship to the ship" inquiry, the court canvassed the legislative history behind the vessel exception and summarized the Schlei memo, concluding "that both Congress and the President intended the 'vessel exception' to be limited to situations such as where service members were aboard a vessel, in the immediate vicinity and in the process of boarding, or attached to vessels and absent without authority in foreign ports."  *Id.* at

45.  There is no authoritative interpretation of the vessel exception in this Circuit.[11]

### 3.      Correction of Military Records

The relief plaintiff seeks in this case requires alteration of his military records.  "The

Secretary of a military department may correct any military record of the Secretary's department

when the Secretary considers it necessary to correct an error or remove an injustice," and the

Secretary usually will do so by "acting through boards of civilians of the executive part of that

military department."  10 U.S.C. § 1552(a)(1).  "The Board for Correction of Naval Records,

composed of civilians appointed by the Secretary of the Navy, provides [a] means with which an

aggrieved member of the military 'may correct any military record . . . when [the Secretary of the

Navy acting through the Board] considers it necessary to correct an error or remove an

injustice.'" *Chappell v. Wallace*, 462 U.S. 296, 303 (1983) (quoting 10 U.S.C. § 1552(a)).

## II.    MERITS

### A.    Motion to Dismiss

The Secretary urges dismissal for failure to state a claim under Federal Rule of Civil

Procedure 12(b)(6), on the ground that Piersall never requested a court martial under 10 U.S.C. §

815(a), and never has requested one.  The Court rejects this as a basis for dismissal because this

issue was never raised before the BCNR and might thus be deemed waived.  This is an action for

review of the Secretary's handling of Piersall's BCNR petition, and the Court must consider the

---

[11]In *Robinson v. Dalton*, 45 F.Supp. 2d 1, 2 (D.D.C. 1998) (Robertson, J.), another judge
in this District suggested that *Edwards* "limits the vessel exception" to the three specific
situations listed in the Schlei memorandum. The court made that observation in the course of
determining that the service member had advanced a non-frivolous argument resting on that
interpretation of *Edwards*, which the Navy had failed to consider, thus warranting remand. To the
extent this could even be read as the *Robinson* court's own interpretation of *Edwards*, rather than
its mere summary of a litigant's argument, it is dicta, and is not binding on this court at any rate.

basis that the agency relied on for its action, not some other basis.  *Douglas Foods Corp. v. NLRB*, 251 F.3d 1056, 1064 (D.C. Cir. 2001).

The Court also would be reluctant to dismiss for failure to demand court martial for other reasons, including the fact that Piersall was never informed that he had a right to make such a demand, for the simple reason that the Navy contended he did not have the right.  His request would have been futile.  Further, where service members do have the right to refuse mast, they have a corollary right to be informed of that option and to have an opportunity to consult with counsel. *United States v. Booker*, 5 M.J. 238 (C.M.A. 1977).  Instead of being so informed, Piersall was given a form indicating that he had no right to refuse NJP.

### B.      Summary Judgment

#### 1.      Scope of Review of BCNR Decision Under APA

The Secretary's denial of an application for correction to a military board of records corrections is a final agency action reviewable under the Administrative Procedure Act.  *See Miller v. Lehman*, 801 F.2d 492, 496 (D.C. Cir. 1986); *McDougall v. Widnall*, 20 F.Supp. 2d 78, 82 (D.D.C. 1998) (Green, J.).  As the Court of Appeals noted in this case, this Court's standard of review over the Secretary's decision is "particularly deferential."  *Piersall v. Winter* 435 F.3d 319, 325 (D.C. Cir. 2006).  BCNR decisions "can be set aside if they are arbitrary, capricious, or not based on substantial evidence."  *Chappell* at 303; *see also Frizelle v. Slater*, 111 F.3d 172, 176 (D.C. Cir. 1997); *Miller*, 801 F.2d at 496 (BCNR decision reviewed to determine whether it is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' and whether it was supported by 'substantial evidence.'") (quoting 5 U.S.C. § 706(2)(A),(E).

This review does not dive deeply into the merits, being more concerned with whether the

Secretary followed the prescribed procedures, considered all the evidence, and reached a result

that it is not unreasonable.  "Adjudication of these claims requires the district court to determine

only whether the Secretary's decision making process was deficient, not whether his decision

was correct."  *Kreis v. Secretary of the Air Force*, 866 F.2d 1508, 1512 (D.C. Cir. 1989); *see also*

 *Motor Vehicle Mfrs. Ass'n.v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("the scope

of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute

its judgment for that of the agency."); *Mudd v. Caldera*, 134 F.Supp. 2d 138, 141 (D.D.C. 2001)

(Friedman, J.) (emphasizing court's "limited role" and the "deference it owed" when reviewing

similar decision by Secretary of Army under APA); *McDougall,* 20 F.Supp. 2d at 82 (decision by

Air Force Board for Correction of Military Records entitled to "great deference"); *Wales v.*

*United States*, 14 Cl. Ct. 580, 587 (Cl. Ct. 1988) (review of Army Board for Correction of

Military Records "is limited to determining whether the decision was arbitrary, capricious, or in

bad faith, or unsupported by substantial evidence, or contrary to law, regulations or mandatory

published procedure of a substantive nature by which plaintiff has been seriously prejudiced.").

    "[T]he plaintiff has the burden of showing 'by cogent and clearly convincing evidence'

that the decision was the result of a material legal error or injustice."  *Doyle v.* England, 193

F.Supp. 2d 202, 207 (D.D.C. 2002) (Urbina, J.) (citing *McDougall*, 20 F.Supp. 2d at 82).  At the

same time, there is a "strong but rebuttable presumption that administrators of the military, like

other public officers, discharge their duties correctly, lawfully, and in good faith."  *Sanders v.*

*United States*, 594 F.2d 804, 813 (D.C. Cir. 1979); *see also id.* ("Strong policies compel the court

to allow the widest possible latitude to the armed services in their administration of personnel

matters.").

"Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record." *Fund for Animals v. Babbitt*, 903 F.Supp. 96, 105 (D.D.C. 1995).  It must be emphasized that the Court's review is limited to the administrative record, which "includes all materials compiled by the agency that were before the agency at the time the decision was made."[12] *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996) (internal quotations and citations omitted); *see also Doyle v. England*, 193 F.Supp. 2d 202, 206 (D.D.C. 2002); *see also Richards v. INS*, 554 F.2d 1173, 1177 n.28 (D.C. Cir. 1977).

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The initial burden is on the movant to demonstrate the lack of a material fact dispute.  *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 2007 U.S. Dist. LEXIS 51309 at *75, Civil Action No. 99-3311 (D.D.C. July 17, 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The substantive law determines what facts are material, and a dispute over a material fact is genuine, and thus can bar summary judgment, where a reasonable jury could find in favor of the nonmovant.  *Id*.  While the nonmoving party is

---

[12]Here the agency's articulation of its reasons includes a number of materials that are referenced in the decision of the second BCNR panel, such as the opinion letters from the Navy's Judge Advocate General, the various submissions by plaintiff's counsel, and the first BCNR panel's report.  Where "the necessary articulation of basis for administrative action can be discerned by reference to clearly relevant sources other than a formal statement of reasons, we will make the reference."  *Environmental Defense Fund, Inc. v. EPA*, 465 F.2d 528, 537 (D.C. Cir. 1972); *see also Miller v. Lehman*, 801 F.2d 492, 497 (D.C. Cir. 1986) (in reviewing BCNR decision, considered JAG opinions that were submitted to the BCNR).

entitled to all reasonable inferences in his favor, *id*. at *76, he "may not rely solely on allegations or conclusory statements.  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor."  *Doyle*, 193 F.Supp. 2d at 206.

      **2.**     **Analysis**

The Court's task is now well defined, and indeed quite narrow: to determine whether the Secretary's decision that correction of Piersall's records was not "necessary to correct an error or remove an injustice" was arbitrary or capricious, in bad faith, unsupported by substantial evidence, or contrary to law.  In its 26-page report, the BCNR summarized the events leading up to Piersall's mast and the administrative proceedings that came after it.  The BCNR summarized and analyzed a number of inputs: the report of the first BCNR panel, the multiple submissions by plaintiff's counsel, the legislative history behind the vessel exception, the cases construing the exception, and the multiple advisory opinions submitted to the Board by the Deputy Director of the Criminal Law Division of the Navy Judge Advocate General, who is often referred to as "Code 20."[13]  After this survey of its sources, the Board then concluded that Piersall was subject to the vessel exception at the time of his mast proceeding, and thus did not have a right to demand court martial.  The Board concluded that, based on specific facts, Piersall was in the

_____

    [13]As an initial matter, Code 20 opined that it was unclear whether the vessel exception applied to Piersall.  Armed with slightly more information, Code 20 later opined that it did not apply, since he was not literally in the "immediate vicinity" of *La Jolla* and was not literally "in the process of boarding" her.  Before the first BCNR panel ruled, Code 20 switched course, opining that the vessel exception did apply.  This advisory opinion contained a much more comprehensive analysis of the vessel exception as applied to this case, articulated a test that looked to the totality of the circumstances, and found that the nature of Piersall's relationship to *La Jolla* dictated that the exception should apply to him.   Code 20 submitted a substantially similar advisory opinion for consideration by the second BCNR panel.  Plaintiff's counsel submitted responses to each of these opinions.

immediate vicinity of *La Jolla* and in the process of boarding her when his mast was held, and that even if Piersall was not deemed to be in the ship's immediate vicinity, his relationship with it was still sufficient to justify application of the vessel exception to him.  Having concluded that Piersall did not have a right to demand court martial, the BCNR determined that there was no error or injustice to correct, and recommended that the Secretary deny Piersall further relief.  The Secretary adopted that recommendation.

Mindful of the deferential standard of review, the Court finds that the Secretary's decision to adopt these BCNR recommendations was not arbitrary, capricious, or contrary to law. There is therefore no basis for disturbing this agency action under the APA, and summary judgment in favor of the Secretary is appropriate.  The Court reviews each of the Board's three major conclusions below.

### a.    Relevant time for assessing applicability of vessel exception

The Board agreed with the first BCNR panel that NJP was "imposed" on Piersall, for purposes of the vessel exception, on February 19, 1998, concluding that, "[i]n view of the legislative and regulatory history, common sense and the JAGMAN, applicability of the vessel exception to Petitioner depends entirely on his status as of that date." AR at 234.  The BCNR thus concluded that the timing of the delivery of the letter of reprimand was "irrelevant."[14]  *Id.*

The language of Article 15(a) suggests that the vessel exception must be evaluated as of the time NJP is "imposed," and paragraph 3 of Part V of the MCM confirms this, stating that a

---

[14]The Assistant General Counsel's reference, which sent the matter back to the BCNR, specifically asked it to review the vessel exception and Piersall's status *after* his mast proceeding occurred.  But the Board cannot be faulted for failing to consider or failing to give proper weight to post-mast events, since it reasonably concluded that such factors were not relevant.

person is "attached to or embarked in a vessel" if:

> at the time the non-judicial punishment is imposed, that person is assigned or attached to the vessel, is on board for passage, or is assigned or attached to an embarked staff, unit, detachment, squadron, team, air group, or other regularly organized body.

(reprinted at AR at 122).

Piersall argues that the vessel exception very well should be appraised as of March 6, 1998, when his letter of reprimand was physically delivered to him. At that time, he was on shore in California, and otherwise serving duty aboard *Coronado*. Paragraph 0113c of the Navy's JAG Manual states that letters of reprimand "take effect when imposed," and a letter of reprimand "is imposed when delivered to the offender."[15]  The BCNR concluded that this provision deals only with what its title states: "Effective Date and Execution of Nonjudicial punishments," meaning the dates that punishments become effective for purposes of Navy records and appeals, and when punishments are to be served.[16]  AR at 235. The Board concluded that the JAG Manual provision which controls when NJP is "imposed" for purposes of the vessel exception is instead Paragraph 0110, which is titled "Procedures for Imposition of NJP," and which states that NJP is imposed when announced. AR at 236.

Based on its summary of the history behind the right to refuse NJP, the Board concluded

---

[15]The provisions of the JAG Manual are the Navy's implementing regulations for the UCMJ.

[16]As defendant notes, Paragraph 0113 was changed in 2007, and now reads "Punitive letters. These punishments take effect when imposed. A punitive letter is imposed when announced to the offender." *See* Excerpt from Manual of the Judge Advocate General [53-2]. While this change in wording is interesting, it is not part of the Administrative Record and was not considered by the BCNR in reaching its decision, so it will not be considered by this Court in reviewing that Record and that decision. The Motion for Leave to File [53] this extract from the JAG Manual, which is unopposed, is granted.

that "the intent was to give soldiers and airmen the right to stop the NJP process dead in its tracks before the commander decided the case, in order that the issues of guilt or innocence and punishment could be resolved at a court-martial."  AR at 235.  "It is just as obvious," the Board concluded, "that neither Congress nor the drafters of any version of the MCM ever intended that the right to demand trial go beyond the point when the commander adjudicates guilt or innocence and announces punishment."  AR at 235.

The BCNR supported its conclusion by reference to other Navy regulations, including the provision of the MCM which states that, where a commander conducting an NJP concludes that the service member is guilty of an offense, he shall "inform the servicemember of the punishment imposed."  AR at 235 (referencing MCM provision reproduced in AR at 124).  Similarly, Navy officers who are conducting mast proceedings are instructed to use a script wherein they are to make such announcements as "I impose the following punishment," and "My decision to impose this punishment was based on my determination that you committed the minor offenses."  AR at 128-130.  The BCNR thus concluded that the JAGMAN simply "uses the term 'imposed' in two contexts.  Paragraph 0113c "deals with effective dates and execution of various punishments imposed at NJP," relevant to the timing of appeals and other purposes.  AR at 235.  But Paragraph 0110 actually sets forth the procedures for imposition of NJP.  "Since the subject of the latter paragraph is the imposition of NJP, the Board believes it is more probative on the issue of when NJP is imposed than paragraph 0113, which speaks primarily to effective dates and execution of various forms of punishment."  AR at 236.

The Board also concluded that this was the proper reading of the regulations based on plain common sense, since if Piersall's right to demand trial ran until delivery of his letter, "then

this right lasted well after the commander decided [Piersall's] guilt and determined an

appropriate punishment, exactly the functions of the court-martial he would still be entitled to

elect at that late date." AR at 235. Additionally, if Piersall's interpretation was correct, it would

appear that a letter of reprimand would be the only form of NJP deemed to be imposed "at such a

late time in the process. Accordingly, if the JAGMAN provision cited by counsel is interpreted

to prolong the right to demand trial, it would place those servicemembers who receive a punitive

letter in a much better position than those who receive another form of punishment." AR at 235.

The Board rejected this form of unjustified differential treatment.

The Board's conclusion is not arbitrary, capricious, or contrary to law. First, it is entitled

to a degree of deference, as this arm of the Navy is primarily interpreting the Navy's own

regulations. Second, the conclusion is based on a reasoned analysis that took into account all of

the relevant regulations and the opinions advanced by Code 20, the first BCNR panel, and

plaintiff's counsel. Third, this conclusion is consistent with those reached by Code 20 and the

first BCNR panel. Like the second BCNR panel, they concluded that the crucial time for

consideration of the vessel exception was when the NJP proceeding occurred, and they concluded

that this result was compelled by the language of the provisions, the history behind the vessel

exception, and common sense. The BCNR's interpretation gives effect to all provisions and

furthers the purposes to be served by the rules.

Plaintiff's interpretation, on the other hand, is completely unsupported. He cites no

persuasive authority in support of his proposed interpretation, which would appear to advance no

purpose germane to the vessel exception.[17]  Nothing in the language of Paragraph 0113c suggests

that it is pertinent to the vessel exception analysis.  As the BCNR pointed out, plaintiff's reading

of Paragraph 0113c gives it the unusual effect of endowing the recipients of punitive letters with

greater rights than other naval personnel who are taken to mast; if Paragraph 0113c was intended

to produce this strange result, one might expect it to do so explicitly.  Moreover, the Court cannot

think of, and plaintiff has not suggested, any reason why the drafters of Article 15, the MCM, or

the JAG Manual would want the vessel exception to be evaluated at a point in time after mast

proceedings were held for *any* form of punishment, let alone for only one specific form.  The

premise of the vessel exception is that the exigencies associated with ships in certain

circumstances justifies dispensing with time-consuming court martial procedures and instead

dealing with disciplinary issues in a swift, efficient, and effective manner.  All of this relates to

the situation at the time proceedings are held, and considerations at a later date are, as the BCNR

held, irrelevant.  Plaintiff offers no explanation for his contrary, and quite bizarre interpretation,

other than his insistence that the BCNR should have given literal effect to Paragraph 0113c, read

in isolation.

The BCNR's interpretations are eminently reasonable and "this court is obliged to give

considerable deference to the agency's interpretation of its own regulation, according it

controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Exxon

Corp. v. FERC*, 114 F.3d 1252, 1258 (D.C. Cir. 1997) (quoting *TransCanada Pipelines, Ltd. v.*

---

[17]*Robinson v. Dalton*, 45 F.Supp. 2d 1 (D.D.C. 1998) did state that a letter of reprimand is "imposed" when actually delivered, and in support cited Paragraph 0113c.  That aspect of *Robinson* is based on no analysis and fails to acknowledge Paragraph 0110 or the problems that inhere in its application of Paragraph 0113c, giving it little persuasive authority.  At any rate, *Robinson* is not binding on this Court.

*FERC*, 878 F.2d 401, 411 (D.C. Cir. 1989)).  The BCNR's interpretation is not plainly erroneous or inconsistent with the Navy regulations at issue, and, indeed, the Court agrees with the BCNR that its interpretations may in fact be the *only* reasonable ones available.  As such, the Court will not disturb them.

> ii.    **Whether Piersall was in the immediate vicinity of and in the process of boarding a vessel at the time NJP was imposed**

Having determined that its inquiry should focus on the point in time when the mast proceeding occurred, the Board concluded that it was bound by *United States v. Edwards*, 46 M.J. 41 (C.A.A.F. 1997), but "reject[ed] the proposition that the case compels relief, even though it may be read to elevate the *Schlei* memorandum to the status of positive law.  If so, the vessel exception may only be invoked if a servicemember was aboard a vessel, in the immediate vicinity (of a vessel) and in the process of boarding, or attached to a vessel and absent without authority in a foreign port."  AR at 236.  Concurring with the first BCNR panel, the Board concluded that even under a strict interpretation of the Schlei memo, plaintiff was in the immediate vicinity of and in the process of boarding *La Jolla* at the time of his mast.  The BCNR concluded that the site of the mast "was in sufficiently close proximity to LA JOLLA to be deemed in the ship's 'immediate vicinity.'  It was on the same installation as the pier at which LA JOLLA was tied up, and clearly was easily accessible from the ship."  AR at 236-37.  In addition, plaintiff could be considered to have been in the process of boarding because "even though Petitioner may have departed the ship a few hours before the NJP, he was still the XO and obviously retained that close association with LA JOLLA up until the NJP."  AR at 237.  "Indeed," the Board observed, "had COMSUBGRU SEVEN found him innocent of the specification of dereliction of duty lodged against him, it is clear that he would have returned to

LA JOLLA as XO, and not just to pick up personal items," because he was not detached from *La Jolla* until after the adverse finding at the mast.  AR at 237.

This conclusion is not arbitrary or capricious, is supported by substantial evidence, and is not contrary to law.  The Court does not find error with the standard articulated by the Board for application of the vessel exception.  The Board essentially assumed, for the sake of argument, that the plaintiff's principal argument was correct: that *Edwards* makes the Schlei memorandum the governing standard for application of the vessel exception, and that this standard is to be applied only by reference to the literal words Schlei used in his three-part list.  Here the Court must proceed with deference where the Navy is interpreting its own implementing regulations and other rules, and where it deals with matters peculiarly within its own province, touching on its own institutional competencies.  The Court will not defer to the agency, however, where the task at hand is judicial interpretation of judicial decisions, as this falls foursquare in the bailiwick of the judiciary.  *Akins v. Federal Election Commission*, 101 F.3d 731, 740 (D.C. Cir. 1996) (*en banc*), *vacated on other grounds*, 524 U.S. 11 (1998); *see also Cellwave Telephone Servs., LP v. FCC*, 30 F.3d 1533 (D.C. Cir. 1994).  The *most* that arguably could be said of *Edwards* is that it embraced Schlei's three-part list as an exclusive, and the Court cannot find error in the Board's willingness to apply, at least for the sake of argument, the most narrow plausible interpretation of the vessel exception, which is the one most favorable to plaintiff.[18]

---

[18]While plaintiff puts most of his emphasis on the Schlei memorandum, he has at times argued that "[t]he vessel exception does not apply when mast is imposed ashore," no matter what.  Opp. [48] at 16.  In this, he relies on a scholarly journal article which at times advances the theme that "the vessel exception should not apply when non-judicial punishment is imposed ashore."  Dwight H. Sullivan, *Overhauling the Vessel Exception*, 43 Nav. L. Rev. 57, 99 n.1 (1996).  But the author of that article acknowledged that, regardless of when he thinks the exception *should* apply, the exception *does* apply in some cases on shore, by its very terms, and

The Board's conclusion that plaintiff was in the immediate vicinity of *La Jolla* and in the process of boarding her is supported by substantial evidence, such as the factors listed by the Board.  This is not a case where the BCNR failed to consider facts or factors that it should have, or overlooked entire arguments.  *See, e.g., Frizelle v. Slater*, 111 F.3d 172, 177 (D.C. Cir. 1997); *Mudd v. Caldera*, 26 F.Supp. 2d 113 (D.D.C. 1998) (Friedman, J.).  Plaintiff argues that the Board should not have considered what *would have* happened had he not been found guilty at his mast, but BCNR did not rely on a hypothetical or counterfactual.  It simply took account of the evidence of Piersall's relationship to *La Jolla* at the time of his mast: he had been serving his duties aboard her and left *La Jolla* several hours before his mast, for the sole purpose of attending his mast; he remained under orders to her; he had left his personal items aboard her; and he would have been under orders to resume his duties aboard her, but for his detachment, which occurred only as a result of the adverse finding at the mast.  Based on these indicia of his relationship to *La Jolla*, and the fact that his presence on shore was meant to be for the limited purpose and duration of attending his mast proceeding, the BCNR's conclusion that he was in the process of boarding *La Jolla* was reasonable and well supported.

The Board's application of the phrase "in the immediate vicinity and in the process of boarding" to the facts of this case finds support in the Schlei memorandum itself.  Just prior to listing the circumstances in which the vessel exception should apply, Schlei described the

---

no authority has ruled otherwise.  Any argument that the vessel exception could *only* apply to ships at sea is untenable for several reasons, such as the fact that it would render nugatory Article 15's use of the phrase "attached to," because if the exception only applied to ships at sea, it would only apply to those "embarked in" a vessel.  If that is how the exception was meant to apply, it would be phrased that way.  The BCNR cannot be faulted for rejecting this interpretation of the vessel exception, as it is contrary to law.

archetypal situation in which it should not:

> to members who are assigned to organizations which have received overseas travel orders even though those organizations are still at duty stations that are considerably removed from the vessel involved, and without regard to whether actual boarding of the vessel is planned for the immediate future (for example, an organization at a base 100 miles form the port involved, and scheduled for overseas shipment 30 days in the future).

AR at 220.  In stating that the vessel exception would apply to personnel "in the immediate vicinity and in the process of boarding" a ship, Schlei was drawing a distinction with personnel who, though under orders to a ship, were "considerably removed" (100 miles) and whose actual departure was in the remote future (30 days).  By contrast, Piersall was in the same port as his ship, had just left his ship, and, unless detached from her, would have had to return to his ship immediately, as she was expected to get under way soon.[19]

There is simply no support for plaintiff's contention that Schlei intended for the exception to apply only to "mast held at dockside as the crew returns from liberty."  AR at 23.  Indeed, this contention ignores the fact that Schlei was writing about the vessel exception as it applied to *all* of the service branches, and indeed, of "organizations which have received overseas travel orders" seems to refer to the Army and Air Force, not the sea services.  Given the logistics involved with embarking large military units and their machines and materiel aboard a ship, along with the fact that Schlei contemplated the vessel exception applying uniformly to "organizations" as a whole, it is quite reasonable to conclude that a unit might be "in the process of boarding" a ship even though some members of the unit are farther away from the ship than others, at distances that might be measured in miles, and that they might be on shore and in the

---

[19]*La Jolla* departed Chinhae on February 22.  *See* Plaintiff's Supplemental Statement of Material Facts. [48-3] at ¶ 10.

process of boarding for periods exceeding the several hours Piersall spent ashore.  Schlei's

memorandum thus suggests that a ship's "immediate vicinity" will depend on the context.

> iii.  **Application of vessel exception if Piersall was not in the immediate vicinity of a vessel**

Having determined that Piersall was subject to the vessel exception under a strict, literal

reading of the Schlei memorandum, the Board went on to conclude that, "[e]ven if Petitioner was

not in the immediate vicinity of LA JOLLA and in the process of boarding, the Board agrees with

the first panel that *Edwards* does not require a rigid application of the *Schlei memorandum* in

determining whether a member was attached to or embarked in a vessel." AR at 237.  The Board

reasoned that the *Edwards* court's use of the phrase "such as" in front of Schlei's three-part list

meant that it "did not intend to require that an individual's case necessarily fit within the four

corners of the *Schlei memorandum*, but only that it serve as a general guideline." AR at 237.

The BCNR noted that literal application of the Schlei memorandum would mean that the vessel

exception would not apply to plaintiff because of the fact that Admiral Konetzni made plaintiff

come ashore to him, whereas it would have applied had the Admiral made the trip to *La Jolla*

and held the mast there.  This "would draw a distinction without a meaningful difference and

militates against a rigid application of the *Schlei memorandum*." AR at 237.  This was consistent

with the first BCNR panel's conclusion, as well as the last two advisory opinions from Code 20.

Based on this less rigid understanding of the vessel exception, and "[g]iven [Piersall's]

close relationship with LA JOLLA when NJP was imposed, the Board believe[d] that invocation

of the vessel exception in [his] case fit within the spirit of the *Schlei memorandum* and was

therefore consistent with *Edwards*." AR at 237-38.  The Court concludes that this determination

by the Board is not arbitrary, capricious, unsupported by substantial evidence, or contrary to law.

Indeed, the Board's conclusion is based on a much more sound legal analysis than one that would call for rigid application of the Schlei memorandum.

*Edwards* should be read for what it is; the last two Code 20 advisory opinions, as well as the two BCNR opinions, provide a reasonable and well reasoned analysis of the case.  It did not exalt the Schlei memorandum above all else.  After canvassing the entire history behind the vessel exception – not just Schlei's memorandum – the *Edwards* court concluded that "both Congress and the President intended the 'vessel' exception to be limited to situations such as where service members were aboard a vessel, in the immediate vicinity and in the process of boarding, or attached to vessels and absent without authority in foreign ports."  *Edwards*, 46 M.J. at 45.  As both panels of the BCNR noted, *Edwards* concluded that the vessel exception would apply in situations "such as" those noted by Schlei; it did not purport to adopt the three items as an exclusive, literal definition.

The actual test formulated by *Edwards* could hardly be farther from the kind of exclusive list plaintiff advocates.  As articulated by *Edwards*, the test looks to the totality of the circumstances to determine whether the service member's "relationship to the ship [was] sufficient to satisfy what Congress intended by the words 'attached to or embarked in,' and thus sufficient to trigger the exception to the statutory right to demand trial."  *Id.* at 43-44.  It also would have been anomalous for the *Edwards* court to embrace a mechanical, stiffly literal analysis for the vessel exception, while at the same time crafting a multi-factored, totality of the circumstances test for determining what constitutes a "vessel" to begin with.  *Id*. at 45.  Like the "relationship to the ship" test, "vessel" is to be defined by reference to "several factors" with a view to determining "whether withdrawing the right to demand trial is consistent with the

congressional intent behind the vessel exception." *Id.* at 45.

*Edwards* even envisioned that the rationale for the vessel exception might apply to a case such as this, because "a ship might become nonoperational under circumstances for which the vessel exception should apply, such as a casualty at sea, accidental grounding or collision, or wartime damage," because "discipline 'at sea' must be maintained." *Id.* at 45.  Moreover, just as in this case, the sailor in *Edwards* was assigned to the crew of the ship in question at the time of his NJP, and the court was willing to accept this as prima facie evidence that he was subject to the vessel exception.  If rebutted, this presumption could be bolstered with evidence of "whether he lived aboard, performed duties aboard, was administered nonjudicial punishment aboard, or served his punishment aboard." *Id*. at 46.  None of these factors would be significant under plaintiff's interpretation of *Edwards*, since one need look only to the literal terms of the Schlei memorandum.

The BCNR's conclusion that *Edwards* did not turn the Schlei memorandum into a rigid test finds perhaps its strongest support in the Schlei memorandum itself.  The principal concern Schlei expressed was that the vessel exception could be read to apply to military personnel whose only relationship to a ship was on paper, and who were far away from a ship and not scheduled to board any time soon.[20]  Piersall would have the Board take just two sentences from the memorandum as stating Schlei's "rule," but the memo is written as a whole and should be read as such.

Moreoever, Schlei spoke at the level of "organizations," that is, discrete military units.  It

---

[20]As Schlei described it, this concern apparently had more to do with the Army and Air Force than with the Navy.

does not purport to cut back on the MCM's definition of "attached to" a vessel, which includes those "assigned or attached to an embarked staff." That definition fits Piersall quite well. From what can be gleaned from Schlei's brief memo, he was not concerned with individual sailors who briefly came ashore and whose entire unit remained ship-based. Instead, Schlei addressed the troublesome scenario where an entire "organization" was far removed, in time and space, from any ship. He did not have occasion to address the situation here, which is the exact opposite: Piersall's entire crew was embarked in a ship that was expected to depart soon. Courts have had little hesitation in applying the vessel exception to such cases. *See Bennett v. Tarquin*, 466 F.Supp. 257, 260 (D. Haw. 1979); *St. Clair v. Secretary of the Navy*, 155 F.3d 848 (7th Cir. 1998).

Perhaps most tellingly, Schlei wrote that paragraph 132 of the MCM was to be read in conjunction with his memorandum, and that it would take too long to craft a substitute. He did not say that his memorandum was replacing paragraph 132, or that his memorandum would become the sole definition for the vessel exception. If the services had intended that result, they could have simply substituted Schlei's list for paragraph 132. Schlei clearly was trying to convey the general meaning of the vessel exception, and he did so by describing an archetypal situation in which it should not apply, as well as general descriptions of three archetypal situations in which it should apply. In short, the Schlei memorandum does not demand that its terms are to be construed narrowly, literally, or exclusively, and nothing in *Edwards* purports to give the memorandum that effect.[21] The BCNR's conclusion that *Edwards* and the Schlei memorandum

---

[21]Plaintiff argues that the vessel exception should be construed narrowly because exceptions should be construed narrowly, as a general rule. Mot. Summ. Judgment [11] at 13-14 (citing *Comm'r v. Clark*, 489 U.S. 726, 739 (1984)). This point is weak. That maxim is simply a

simply set forth general guidelines for determining whether the vessel exception should apply is both reasonable and well reasoned.

Vessel exception cases have generally been consistent with *Edwards*' focus on the service member's relationship to the ship.  They have looked not to literal definitions but to multiple factors that affect the propriety of allowing or denying the right to refuse mast.  For instance, a sailor may not be attached to or embarked in a ship where his ship was nonoperational and undergoing a long-term overhaul scheduled to last several months after the sailor's court martial, and the sailor berthed ashore and served his punishment ashore.  *United States v. Lorance*, 35 M.J. 382, 383 (C.M.A. 1992); *see also United States v. Valead*, 32 M.J. 122 (C.M.A. 1991) (similar facts).  These courts have looked at all "indicia of attachment," viewed in the context of the ship's "unique mission."[22]  *Bennett v. Tarquin*, 466 F.Supp. 257, 260 (D. Haw. 1979).  These factors have included the service member's assignment orders, including whether they show the

---

shorthand way of saying that, in the absence of other evidence, the drafters of general rules typically want exceptions to them read narrowly, lest the exception swallow the rule.  Here the the Board carefully addressed indicators of the actual intention behind the vessel exception.  This also points out how susceptible canons of construction are to manipulation: the right of refusal is, in a sense, itself an exception to the authority of commanders to impose NJP, and the vessel exception is an exception to the right of refusal.  The Court is not aware of a canon that guides the construction of exceptions to exceptions, and instead prefers the straightforward mode of interpretation practiced by the BCNR.

[22]Where the exception has been found not to apply, it has been where nearly all salient factors suggest that the service member's relationship to the ship is not possessed of the exigencies that typically justify nonjudicial punishment.  *See, e.g., United States v. Lorance*, 35 M.J. 382 (C.M.A. 1992).  In that case, which involved the vessel exception in Article 15(b), which *Edwards* ruled is equivalent to the vessel exception in Article 15(a),  the court was willing to consider the ship's operational status, which went to whether it was a vessel at all, but also the sailor's relationship to the ship.  The sailor was berthed in barracks ashore, his punishment was imposed there, he served his sentence there, and because of the status of his ship, he would remain there for months to come.

ship as his service address, whether he draws pay for at-sea service, and whether he is credited

with a sea tour. *Id*. Also relevant is whether the sailor "lived aboard, performed duties aboard,

was administered nonjudicial punishment aboard, or served his punishment aboard." *Edwards* at

46.

Based on all the relevant factors, there is substantial evidence in the record to support the

Secretary's determination that the exception applied to Piersall whether or not he was in *La*

*Jolla*'s "immediate vicinity" as envisioned by a strict reading of the Schlei memorandum.  For

instance, Piersall remained assigned to *La Jolla* at all relevant times.  *Edwards* accepts this as

prima face evidence that the vessel exception applies.  As Code 20 opined in an August 24, 2006

advisory opinion, "[r]ead together, the key military and federal court cases dictate that service

members are presumed 'attached,' for vessel exception purposes, when still serving under orders

to a vessel." AR at 116.  In addition, Piersall lived aboard and performed duties aboard *La Jolla*

up until the moment he left her to attend his mast.  As the BCNR pointed out, he would have

been under orders to return to her but for his detachment at the mast.  His traveling ashore for his

mast proceeding did not change the fact that he was assigned to *La Jolla*.  Somewhat analogous

is the case of *St. Clair v. Secretary of the Navy*, 155 F.3d 848 (7th Cir. 1998), where a sailor

assigned to a submarine docked at the New London port was given NJP ashore for a drunk

driving offense committed ashore.  He was found to still be attached to the ship and subject to the

vessel exception, mainly because he was still assigned to the ship.  The fact that he was on shore

did not disrupt that status, as he was only on shore because he had been ordered confined to

barracks for an earlier violation.  If a sailor can still be attached to a ship for purposes of the

vessel exception despite a short-term presence on shore, then certainly Piersall's nexus to his

ship could still have been sufficiently close, since his presence on shore was only for several hours and only for the purpose of attending his mast.

Fundamentally, the cases dictate that the Board was correct in recognizing that the real test is whether the circumstances justify or necessitate the use of NJP as "a method of adjudication peculiar to the armed forces in which the commander is authorized to expeditiously yet fairly dispose of minor offenses by adjudicating guilt or innocence and imposing punishment, instead of resolving every instance of misconduct in the more time consuming court-martial process." AR at 235. There certainly is substantial evidence in the record to support the conclusion that dispatch was important here: a significant incident with a foreign vessel had to be investigated and resolved, a new commanding and executive officer put in command, and the ship repaired and put back under way quickly. The cases support the conclusion that imposition of NJP in this instance, without the right to demand court martial, was justified by the exigencies of the situation, and the cases support the conclusion that *this* is the real test for applicability of the vessel exception.

For instance, in *Bennett v. Tarquin*, 466 F.Supp. 257 (D. Haw. 1979), a nuclear submarine used two crews, a Blue Team and a Gold Team, that would rotate in and out of ship-borne service. The crew that was not aboard ship would conduct training exercises at a shore-based facility until its turn to rotate onto the ship. The court held that the vessel exception applied to members of the shore-based crew who were on shore for most of the conduct giving rise to mast proceedings, and whose mast proceedings were held on shore. Among other things, the court looked to the fact that both crews were under orders showing their service address as the ship, they drew submarine pay for a sea tour even while they were ashore, they were subject to instant recall to the ship at all times,

31

and they were credited with a full sea tour.  Given these "indicia of attachment," and keeping in mind the submarine's "unique mission," the court concluded that all members of both crews should be deemed attached to or embarked in the vessel.  *Id*. at 260.  If anything, *Edwards* bolsters *Bennett*'s holding and its mode of analysis.  At the time of his mast, Piersall's relationship to his ship was even stronger than that of the sailors at issue in *Bennett*.

The BCNR carefully reviewed the legislative history preceding the vessel exception and the cases interpreting it, and they all support the notion that the vessel exception is to be construed with an eye toward achieving its principal purposes, and that this is best done by considering the totality of the circumstances.  AR at 216-219.

## III.   CONCLUSION

Commander Piersall should be, and often has been, commended for his long and distinguished career of service to the Navy and to our country.[23]  But given the unusually deferential standard of review applied to the decisions of military records correction boards, *Cone v. Caldera*, 223 F.3d 789 (D.C. Cir. 2000), given the absence of any genuine factual dispute that is material, and given the entire administrative record, the Court holds that the Secretary's decision that correction of plaintiff's military records was not necessary to remove an error or correct an injustice – as explained in the report of the BCNR which the Secretary endorsed – is not arbitrary or capricious, is supported by substantial evidence, and is not contrary to law.[24]  Plaintiff's motion for summary

---

[23]Plaintiff's counsel has ably outlined some of the highlights of Commander Piersall's career, none of which has been disputed.  AR at 12-15.

[24]The first BCNR panel considered and rejected all of Piersall's other arguments, except those for which it provided him relief.  The Secretary stood by these rulings, and they were not referred to the second panel.  Based on his briefing, plaintiff seems only to seek review of the second panel's conclusion that the vessel exception applies.  In any event, the Administrative

judgment [11] is therefore denied, defendant's motion for summary judgment [45] is granted,

judgment shall issue in favor of defendant, and the Amended Complaint shall be dismissed.

A separate Order shall issue this date.

SO ORDERED.

Signed by United States District Judge Royce C. Lamberth, August 21, 2007.

---

Record and the first BCNR panel's reasoned analysis provide ample support for each of those conclusions, and each passes muster under the APA.  For instance, after considering the contending theories from all sides, the BCNR dispatched with most of plaintiff's arguments by finding dispositive support in Navy regulations, such as those stating that NJP hearings are to proceed under a preponderance of the evidence standard.  On each point, the connected the facts it found to the conclusions it reached, such as where it determined that plaintiff was not entitled to relief on his claim of ineffective assistance of counsel during his appeal of the NJP.  The BCNR also pointed to documentary evidence in support of its conclusion that plaintiff was "of the command" of Admiral Konetzni at the time of his NJP, and thus Konetzni had authority to hold the mast proceeding and impose punishment.  AR at 43.  The second panel of the BCNR reviewed this aspect of the first panel's decision and reached the same conclusion.  The Court cannot find fault with any of these conclusions.